**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

FEDERAL DEPOSIT INSURANCE
CORPORATION, In its Corporate and
Receivership capacities,
                    *Plaintiff-Appellee,*

v.

SEAN BAKKEBO,
                    *Defendant-Appellant,*

and

RONALD MITCHELL, Individually and
as Trustee for the Mitchell Family
Trust; PIETER OOSTHUIZEN; BRIAN
BAKKEBO; P. TODD ZERAS; MICHELE
BOWLING; FELIPA CHADWICK; DAVID
ARONOFF, as Trustee for the Michele
L. Bowling Family Trust; HORMOZ
REDJAI, as Trustee of the P. Todd
Zeras Family Trust; ROBERT HARRIS,
as Trustee for the P. Todd Zeras
Family Trust; PRIME FINANCIAL
CORP; ARGENT MORTGAGE
CORPORATION, formerly known as
Clearview Capital Corporation; F.S.
HOLDINGS, S.A.; RONHARDAN
CAPITAL; R. C. GRAYSON &
COMPANY; ROYAL CONSULTING
GROUP, A.S.; HARPERS EINDOM, A.S.;

No. 05-2175

New Century Holdings, A.S.; New
Centurians Corporation; Tripoint
Capital Corporation; Southpac
Trust International, Incorporated,
as Trustee of the P. Todd Zeras
Family Trust and as Trustee for the
Michele L. Bowling Family Trust;
H. Lynden Graham, Jr.; Daniel M.
Melgar; Richard A. Sleight,
                                    *Defendants.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Bluefield.
David A. Faber, Chief District Judge.
(CA-02-1087-1)

Argued: February 2, 2007

Decided: October 25, 2007

Before MICHAEL and KING, Circuit Judges, and WIDENER,[1]
Senior Circuit Judge.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Michael joined.

## COUNSEL

**ARGUED:** Jeffrey Lee Dorrell, Houston, Texas, for Appellant. Jac-
lyn Chait Taner, FEDERAL DEPOSIT INSURANCE CORPORA-

---

[1]Judge Widener heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel. 28 U.S.C. § 46(d).

TION, Legal Division, Appellate Unit, Arlington, Virginia, for Appellee. **ON BRIEF:** Christopher R. Arthur, BAILEY & WYANT, P.L.L.C., Charleston, West Virginia, for Appellant. John Turner, MULLIN, HOARD & BROWN, L.L.P., Amarillo, Texas; Richard J. Osterman, Jr., Assistant General Counsel, Colleen J. Boles, Senior Counsel, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellee.

## OPINION

KING, Circuit Judge:

Harald Bakkebo appeals the $161 million judgment entered against him, in the Southern District of West Virginia, on claims of fraud and conspiracy to commit fraud against the First National Bank of Keystone ("Keystone," or the "Bank").[2] This civil action was initiated and pursued by the Federal Deposit Insurance Corporation (the "FDIC"), the receiver of Keystone. On appeal, Bakkebo contends that the district court erred in denying his December 20, 2004 post-trial motion for judgment as a matter of law, for a new trial or, in the alternative, for a remittitur (the "Post-Trial Motion"). Specifically, Bakkebo contends that the court should have ordered a new trial because it erred in admitting evidence of his earlier indictment on charges unrelated to the conduct alleged in this civil action, and because it made a remark during the trial proceedings that was incurably prejudicial to him. Bakkebo also asserts that the court should have awarded him judgment as a matter of law because the trial evidence was legally insufficient to show that he and his co-conspirators made fraudulent misrepresentations to Keystone, and also to establish that Keystone's reliance on their representations was justified. Finally, Bakkebo maintains that the court should have ordered a new trial or a remittitur because the jury's award of $161 million in damages to the FDIC was against the great weight and preponderance of the evidence. As explained below, we reject each of these contentions and affirm.

[2]Bakkebo, who was the defendant in the district court proceedings and the original appellant in this appeal, died on March 3, 2006, while this appeal was pending. For the sake of simplicity, we continue to refer to him as the appellant in this matter.

## I.

## A.

In the mid-1990s, Bakkebo and several co-conspirators induced Keystone to invest hundreds of millions of dollars in a financial enterprise known as loan securitization, in which Keystone purchased thousands of subprime home loans from the lenders that had originally made the loans (or from other entities that had previously acquired the loans), then resold the rights to most of the loans' proceeds in the form of special mortgage-backed securities.[3] Keystone's loan securitization transactions were orchestrated by Dan Melgar, a close friend and business associate of Bakkebo. Melgar held himself out as an expert in loan securitization and persuaded Keystone to pursue it as a lucrative alternative to the Bank's traditional local lending business. Neither Keystone's officers nor its directors (who were businessmen and professionals living in or around Keystone, the southern West Virginia town in which the Bank was based) had experience with loan securitization, and Melgar effectively exercised sole control over the securitization program in which Keystone engaged. He established the prices that Keystone paid for loans and the prices at which it sold securities. Significantly, he provided projections of future loan performance on which Keystone relied in making its high-stakes foray into loan securitization. Also of importance, Melgar selected the entities with which Keystone would do business in each securitization transaction — the sellers from which Keystone would purchase loans, the loan servicers that would be paid to administer the loans after Keystone purchased them, and the various financial services firms that were needed to facilitate each securitization.

Melgar directed much of Keystone's securitization business to two entities controlled by Bakkebo: Prime Financial Corporation ("Prime") and Clearview Capital Corporation ("Clearview"). Acting on Melgar's advice, Keystone purchased hundreds of millions of dollars in loans — most at premium prices — from Clearview, and also

---

[3]Our statement of the relevant factual underpinnings of this dispute summarizes the evidence in the light most favorable to the FDIC, as the prevailing party in the district court. *See ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 104 n.4 (4th Cir. 2006).

hired Prime to service loans worth several hundred million dollars. Keystone was unaware, however, that Prime and Clearview were paying Melgar hundreds of thousands of dollars in fees that nominally were for consulting services, but for which Melgar performed no work. Neither Melgar nor Bakkebo disclosed to Keystone that Melgar had a financial incentive to assist Bakkebo's companies in obtaining business.

Keystone's loan securitization program quickly ran into trouble. The Bank conducted four securitizations in 1993 and 1994, and all four performed much worse than Melgar had predicted. The loans that Keystone had purchased proved to be of low quality, and by the end of 1994 Keystone had not earned a single dollar's return on its enormous investment in loan securitization. In December 1994, ContiFinancial ("Conti"), a New York-based underwriter responsible for placing the mortgage-backed securities that Keystone sold, terminated its relationship with Keystone. In so doing, Conti advised Bakkebo, Melgar, and Keystone that the quality of the loans Keystone had securitized was so poor, and that the administration of the securitization program had been so lacking, that Conti foresaw only further losses if it continued to underwrite Keystone's deals.

Melgar, however, advised Keystone that Conti had misrepresented its reason for ending its relationship with Keystone, and that Conti actually had withdrawn as underwriter because it wanted to compete with Keystone in the loan securitization business. Melgar further asserted, in a January 5, 1995 memorandum to Keystone Vice President Terry Church, that the quality of the loans Clearview and Prime were selling had "improved substantially and with the improved quality the deals [sic] performance should improve." J.A. 954.[4] Thus advised, Keystone engaged in six more loan securitizations in 1995 and 1996, involving approximately $980 million in loans. Despite Melgar's assurances that the quality of the loans Keystone was securitizing had improved, these six deals, like the 1993 and 1994 securitizations, were near complete failures. The loans involved performed far below Melgar's projections, and Keystone incurred massive losses as a result.

---

[4]Citations herein to "J.A. ___" refer to the Joint Appendix filed by the parties in this appeal.

In January 1996, Bakkebo was indicted in a Louisiana federal court on insurance fraud charges unrelated to Keystone's securitization program (the "Indictment"). Bakkebo's Indictment jeopardized Prime's license, issued by the Department of Housing and Urban Development ("HUD"), to service so-called Title I loans — a type of subprime mortgage partially guaranteed by HUD. A substantial part of the loans Prime was servicing for Keystone were Title I loans, and so the possibility of Prime losing its Title I servicing license threatened Keystone's securitization business. Keystone responded by seeking to transfer its Title I loans from Prime to another servicer, but Bakkebo refused to release the loans as Keystone demanded — despite having no legal basis for retaining control of Keystone's loans. Instead, he insisted that Keystone purchase Prime from him as a way of ending the association between him and Prime, and thereby removing the threat to Prime's ability to service Title I loans.

Keystone initially resisted Bakkebo's demand. Soon thereafter, however, Prime's performance in servicing Keystone's loans began to decline, worsening the loan securitization program's already disappointing performance and placing Keystone under even greater pressure to regain control of the loans Prime was servicing. In September 1996, Keystone offered to purchase Prime for $3.5 million. On October 3, 1996, Prime countered with an offer to be acquired by Keystone for $5 million. Rather than compromising during the ensuing negotiations, Prime raised its demand. Finally, on October 31, 1996, Keystone agreed to acquire Prime for $8 million in cash, plus substantial additional non-cash compensation, including the forgiveness of several loans Keystone had made to Bakkebo.

B.

In 1999, after incurring further substantial losses from loan securitizations, Keystone collapsed. The FDIC, which had insured Keystone's deposits, was appointed as receiver for the Bank. On August 29, 2002, the FDIC initiated this civil action against Bakkebo (as well as numerous other defendants) in the Southern District of West Virginia.[5] The FDIC's Complaint alleged that Bakkebo had engaged in fraud, as well as civil conspiracy to commit fraud, against Keystone.

---

[5]Federal jurisdiction over this civil action was proper because the FDIC is an agency of the United States. *See* 12 U.S.C. § 1819(b)(1); 28

At the time the FDIC filed its Complaint, Bakkebo was in Norway, having fled the United States in January 1999 to avoid prosecution for the insurance fraud scheme alleged in the Indictment. Because of Bakkebo's location, he and the FDIC agreed that he would submit a sworn narrative statement in this civil action (the "Written Statement") in lieu of giving a deposition. On July 7, 2004, the district court entered a Consent Order regarding the Written Statement's admissibility that barred the FDIC from objecting to the "admissibility [at trial] of this sworn narrative statement on the basis of authenticity, hearsay or the fact that it is in narrative form." J.A. 231. In the Written Statement, Bakkebo discussed the Indictment, indicating that it was the motivation for his flight to Norway and the reason for Keystone's purchase of Prime.

On November 30, 2004, a jury trial commenced on the FDIC's claims against Bakkebo. The trial lasted six days, and resulted in the verdict underlying this appeal. Bakkebo's appeal focuses on five factual aspects of the trial proceedings, which we summarize in turn.

1.

The first and potentially the most problematic of the pertinent procedural facts is the district court's decision to admit evidence of the Indictment. On November 30, 2004, the trial's first day, the court ruled such evidence admissible. On December 1, 2004, the court explained that the evidence was admissible because, in submitting the Written Statement, Bakkebo had "waived any objection to keeping out of evidence his fugitive status and indictment." J.A. 328. The court thereafter instructed the jury, following the close of the evidence on December 9, 2004, that the Indictment evidence could be considered "for the limited purposes of determining whether Bakkebo had any intent to defraud the First National Bank of Keystone, and for assessing his credibility." Trial Tr. vol. 39, 16, Dec. 9, 2004. In its September 16, 2005 Order denying the Post-Trial Motion, the court

U.S.C. § 1345. Moreover, pursuant to 12 U.S.C. § 1819(b)(2)(A), "all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States."

reiterated two reasons for admitting the Indictment evidence: first, Bakkebo had opened the door by discussing the Indictment in his Written Statement; and, second, the Indictment evidence was admissible under Federal Rule of Evidence 404(b) to show Bakkebo's motive, intent, and plan to defraud Keystone.

2.

The second procedural aspect of the trial with significance for this appeal was a question asked by the district court during the FDIC's direct examination of Church, Keystone's Vice President. On December 3, 2004, the trial's fourth day, the FDIC questioned Church regarding Keystone's purchase of Prime and, in particular, the difficulty Keystone experienced in regaining control of the loans Prime was servicing. With regard to that difficulty, the court initiated the following exchange:

> THE COURT: I'm curious about something. Can I ask a question here?
>
> [FDIC'S COUNSEL]: Absolutely, Judge.
>
> THE COURT: This may be a dumb question, but you tried to terminate [Prime] for the misconduct. Why didn't you just fire them for the funny business and misconduct?
>
> THE WITNESS: We tried to, sir.

J.A. 565.

Shortly thereafter, defense counsel objected to the court's use of the term "funny business" in questioning Church (the "'funny business' question") and requested a curative instruction to correct it. The court complied with counsel's request, and immediately instructed the jury as follows:

> Ladies and gentlemen, I'm going to instruct you to disregard the wise crack I made about "funny business" with regard to the loans. That was improper for me to use that term, and

I should not have done it, and you're instructed to completely disregard it.

J.A. 566. Then, on December 7, 2004, after a three-day weekend recess, Bakkebo moved for a mistrial based on the court's "funny business" question. The court denied this motion from the bench. Subsequently, at the trial's conclusion, the court included the following instruction in its charge to the jury:

> During the course of this trial, I had occasion to ask questions of a witness. No question, or for that matter, no statement or ruling which I have made during the course of this trial was intended to indicate my opinion as to how you should decide the case, or to influence you in any way in your determination of the facts.

Trial Tr. vol. 39, 15, Dec. 9, 2004.

In the Post-Trial Motion, Bakkebo asserted that a new trial was warranted because of the prejudicial effect of the "funny business" question. The district court rejected Bakkebo's contention in this regard in its September 16, 2005 Order.

3.

Bakkebo's appeal also calls attention to several aspects of the evidence the FDIC presented at trial. First, with respect to misrepresentations made by Bakkebo and his co-conspirators to Keystone, the FDIC presented two general categories of evidence: evidence that Melgar had misrepresented the general financial performance of Keystone's securitization program, and evidence of Bakkebo's and Melgar's misrepresentations on the more specific subjects of Clearview and Prime.

On the general performance of the securitization program, the FDIC presented evidence that Melgar had advised Keystone, in October 1995, that residuals from the securitizations the Bank had conducted up to that time were worth $45.4 million. Church testified, however, that this valuation had been false, and that by 1999, when

the Bank collapsed, the residuals Melgar had valued at more than $45 million had produced no more than $100,000 in income for Keystone. In addition, the FDIC offered the testimony of Wendy Pack, a former Keystone employee, that Melgar had advised Keystone that the securitization program was making money. But Andrew Davidson, an expert in mortgage-backed securitizations, testified that such a representation by Melgar would have been knowingly false. The FDIC also presented evidence that Melgar had consistently advised Keystone that it could expect to profit from the securitization program, and contrasted this evidence with Davidson's expert testimony that Melgar would have known the program was a complete failure.

With regard to Melgar's specific representations about Clearview and Prime, Church testified that Melgar had advised Keystone that the loans being purchased from Clearview were of high quality and had good scores from debt-rating services. The FDIC also showed that Melgar had represented, in a January 1995 memorandum, that Clearview and Prime were key to the success of the securitization program, that the quality of Clearview's loans had improved substantially, and that the program's performance would improve as a result of Keystone's continued involvement with Clearview.

The FDIC also provided evidence, in the form of testimony from Church and Pack, that the loans Keystone had purchased from Clearview were actually of extremely low quality, with high rates of default and delinquency. Milton Drageset, a former employee of Bakkebo who had worked at both Prime and Clearview, also testified that the loans sold to Keystone by Prime and Clearview were unsound. Drageset explained that the reason for the loans' poor quality was that Prime and Clearview disregarded compliance and credit guidelines, simply making and acquiring as many loans as possible because Keystone would purchase them regardless of their quality. Drageset further testified that Bakkebo had been aware of these practices, and that both Bakkebo and Melgar had known of the poor quality of Clearview's loans.

In addition, the FDIC offered the evidence of Shannon Doyle, a former employee of Prime, that Bakkebo had personally made payments on delinquent loans that were to be sold to Keystone, and had caused negative information to be purged from the files on those

loans, so that they would appear current. Doyle testified that Bakkebo had taken these actions after discussions with Melgar on how to dispose of the delinquent loans.

### 4.

In support of its contention that Keystone justifiably relied on the representations at issue, the FDIC presented Church's testimony that Melgar held himself out as an expert on loan securitization, and that he buttressed that assertion with his ability to involve sophisticated financial firms, such as Conti and Lehman Brothers, in Keystone's securitization program. Church also testified that none of Keystone's officers, nor any of its board members, had any experience with loan securitization before Melgar persuaded them that Keystone should pursue it.

### 5.

Finally, in support of its position on damages, the FDIC presented expert testimony from Harry J. Potter, a forensic accountant. Potter testified that the total losses Keystone incurred from the securitization transactions it conducted in 1995 and 1996 were approximately $147 million, and that the Bank's losses from its purchase of Prime were approximately $14 million. Potter also testified that these losses were caused by the actions of Bakkebo and his co-conspirators.

### C.

On December 9, 2004, after deliberating for approximately three hours, the jury returned a verdict in which it found for the FDIC and awarded damages of $161 million against Bakkebo. Shortly thereafter, on December 20, 2004, Bakkebo filed his Post-Trial Motion. The district court denied the Post-Trial Motion by its Order of September 16, 2005. Bakkebo has appealed the judgment against him, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

### II.

We review de novo a district court's denial of a post-trial motion for judgment as a matter of law. *ABT Bldg. Prods. Corp. v. Nat'l*

*Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 113 (4th Cir. 2006). In so doing, we view the evidence in the light most favorable to the prevailing party, assessing whether there was a legally sufficient evidentiary basis for a reasonable jury to find for that party. *Id.* (citing Fed. R. Civ. P. 50(a)). If reasonable minds could differ about the verdict, we are obliged to affirm the ruling of the district court. *Id.* A district court's denial of a motion for a new trial is reviewed for abuse of discretion, and will not be reversed "save in the most exceptional circumstances." *Figg v. Schroeder*, 312 F.3d 625, 641 (4th Cir. 2002) (internal quotation marks omitted). Likewise, a district court's denial of a motion for remittitur is reviewed for abuse of discretion, as it is within the discretion of the trial court to set aside a verdict as excessive. *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 439 (4th Cir. 2004).

### III.

On appeal, Bakkebo presents five grounds for challenging the district court's denial of his Post-Trial Motion. First, he contends that the court should have awarded him a new trial because it erred in admitting evidence of the Indictment. Second, Bakkebo maintains that he was also due a new trial because of the court's "funny business" question. Third, he contends that the court erred in denying him judgment as a matter of law, because the FDIC presented insufficient evidence that he and his co-conspirators made fraudulent misrepresentations to Keystone. Fourth, Bakkebo maintains that the court also should have granted him judgment as a matter of law because the FDIC offered insufficient evidence that Keystone's reliance on his and his co-conspirators' representations was justified. Fifth, and finally, he asserts that the court should have granted a new trial or a remittitur because the damages awarded by the jury were excessive. We address these contentions in turn.

### A.

We first assess Bakkebo's contention that the district court erred in denying a new trial on the ground that evidence of the Indictment was inadmissible. In pursuing this contention, Bakkebo challenges the court's rulings that his discussion of the Indictment in his Written Statement opened the door to the Indictment evidence at trial, and that such evidence was admissible as well under Federal Rule of Evidence

404(b) to establish his "motive, intent, and plan to defraud Keystone bank." J.A. 1180.[6] Although we agree with Bakkebo that the court gave unsound reasons for admitting the Indictment evidence, we conclude that such evidence was otherwise admissible and, thus, that no error occurred. *Cf. United States v. Johnson*, 54 F.3d 1150, 1156-62 (4th Cir. 1995) (concluding that trial court did not err in admitting summary testimony and chart, despite relying on improper grounds, because admission of such evidence was warranted on alternative bases).

Simply put, the Indictment evidence was relevant to establishing the FDIC's theory of Keystone's purchase of Prime. *See* Fed. R. Evid. 401 (defining "relevant evidence" as evidence tending to prove or disprove material issue of fact); Fed. R. Evid. 402 (providing that "[a]ll relevant evidence is admissible," barring constitutional, statutory, and rule-based exceptions). Under the FDIC's theory, the bare fact that Bakkebo had been indicted in Louisiana jeopardized Prime's ability to service Keystone's Title I loans, and Bakkebo knowingly and intentionally exploited that situation to obtain an inflated price for Prime. Absent the Indictment evidence, the FDIC could not have shown the impetus for the Prime purchase. Thus, we are convinced that the Indictment evidence was relevant — indeed, essential — to the FDIC's case against Bakkebo.

In reaching this conclusion, we need not approve the district court's reasons for admitting the Indictment evidence. *See Johnson*, 54 F.3d at 1156 ("[E]ven if the grounds that the district court gave for admitting the evidence are improper, generally this Court will reverse

---

[6]As heretofore noted, the court's instructions to the jury at the close of the case indicated that Bakkebo's Indictment could also be considered for the purpose of "assessing his credibility." Trial Tr. vol. 39, 16, Dec. 9, 2004. Bakkebo failed to object or raise any issue concerning this aspect of the instructions during trial, or in the post-trial proceedings, or on appeal (though it was mentioned at oral argument in response to questions from the panel). In these circumstances, we do not review and assess whether the court may have erred in connection therewith. *See Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630-31 (4th Cir. 1997) (citing *United States v. Olano*, 507 U.S. 725 (1993)).

only if there are no grounds upon which the district court could have properly admitted the evidence."). Indeed, we are unable to agree that Bakkebo's Written Statement opened the door to the Indictment evidence at trial. It seems elementary that the mere discussion of a subject in discovery does not serve to open the door to trial evidence concerning that same matter, because a litigant is not free to withhold information in discovery on the ground that it would be inadmissible at trial. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). Nor was the Indictment evidence admissible under Federal Rule of Evidence 404(b). At trial, the FDIC did not proffer the text of the Indictment itself, or any other evidence sufficient to establish that Bakkebo had engaged in a fraud scheme in Louisiana. The fact of the Indictment, without any proof of the alleged acts underlying it, was not admissible to prove the commission of a prior crime, wrong, or act, as contemplated by Rule 404(b). *See United States v. Robinson*, 978 F.2d 1554, 1561 (10th Cir. 1992) (approving admission of evidence of prior arrests because evidence went "substantially beyond the mere fact of an arrest").

We have nonetheless concluded that the Indictment evidence was relevant to the contested issue concerning the Prime purchase. Accordingly, the only remaining point for us to weigh is whether its admission was overly prejudicial to Bakkebo in the context of this case. *See* Fed. R. Evid. 403 (providing that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by[, inter alia,] the danger of unfair prejudice"). After considering the record, we accept and credit the trial court's implied ruling that the Indictment evidence was more probative than prejudicial under the Rule 403 balancing test. *See United States v. Lewis*, 780 F.2d 1140, 1142 (4th Cir. 1986) (holding that failure to recite appropriate balancing test is not reversible error, where overall record indicates appropriate judicial weighing). As a result, the court did not err in declining to grant Bakkebo a new trial on the Indictment evidence issue.

## B.

Bakkebo next maintains that the district court erred in not ordering a new trial on account of its "funny business" question. He contends

that the prejudice he suffered from this remark was so severe that the court's subsequent curative instructions were insufficient to eliminate it. Put simply, Bakkebo's position in this regard is also without merit.

A cursory review of the context of the "funny business" question discloses that the court was pointing out a possible inconsistency in the FDIC's case — not criticizing Bakkebo. Specifically, the court was pressing Church to explain why, if Prime's loan servicing had truly been as deficient as she asserted, Keystone did not simply terminate Prime as its loan servicer rather than acquire Prime at an inflated price. As the court conceded, it made a poor choice of words when posing that question. But we are unable to conclude that the court abused its discretion in ruling that this single, isolated remark — made in the context of a question that tested the FDIC's evidence, and subsequently redressed by two curative instructions — fell short of the degree of prejudice that would require a new trial.

## C.

Bakkebo also asserts that the district court should have awarded him judgment as a matter of law because the FDIC's evidence was legally insufficient to support a jury finding that he and his co-conspirators made fraudulent misrepresentations to Keystone. Bakkebo maintains that Melgar's representations regarding Keystone's loan securitization program were merely expressions of opinion or predictions of future performance, and thus, as a matter of law, they did not constitute fraudulent misrepresentations. According to Bakkebo, fraud may be established only by showing intentional misrepresentation of a past or existing material fact, not by evidence of a misrepresentation regarding future occurrences, and the FDIC presented only evidence of the latter type.

Bakkebo's contention in this regard fails for two reasons. First, his position misapprehends the law: misrepresentations regarding future events can serve as the basis for a fraud claim if they are not "made in the honest belief that they will prove correct." *Croston v. Emax Oil Co.*, 464 S.E.2d 728, 732 (W. Va. 1995). The FDIC presented abundant evidence from which the jury was entitled to conclude that Melgar's misrepresentations regarding the future performance of Keystone's securitization program were not made in the honest belief

that they would prove correct. This evidence included Conti's blunt warning that the securitization program was a money-losing venture plagued by low-quality loans and sloppy administration; evidence that Melgar knew the loans Clearview was selling to Keystone were of poor quality; and evidence that Melgar was receiving kickbacks (in the form of unearned consulting fees) from Bakkebo even as he touted the importance of Clearview and Prime to the success of Keystone's loan securitization program. Thus, Melgar's representations of future performance furnished a basis for the jury's finding of fraud.

Second, and equally significant, the FDIC presented evidence that Melgar misrepresented past or existing material facts. This evidence included testimony that Melgar misrepresented the quality of the loans Keystone was purchasing from Clearview, that he falsely advised Church that Keystone was making money from its securitization program, and that he misrepresented the present value of Keystone's residual interests.[7] Bakkebo simply disregards this body of evidence in contending that the FDIC's proof was limited to predictions of future events.

In these circumstances, there was sufficient evidence to sustain a finding that Melgar made fraudulent misrepresentations to Keystone. The district court thus did not err in denying Bakkebo's motion for judgment as a matter of law on that point.

## D.

We next address Bakkebo's contention that there was insufficient evidence that Keystone's reliance on his and Melgar's representations was justified, and that he was therefore entitled to judgment as a matter of law. In support of this view, Bakkebo asserts that Keystone was

---

[7]Bakkebo contends that Melgar's representations regarding the present value of Keystone's residual interests were not, in fact, representations of an existing fact, but rather were mere projections of future revenue adjusted to reflect the discount rate. We disagree. Although the present value calculations in question may have been computed based on predictions of future revenue, the jury could reasonably have concluded that Melgar provided Keystone with the present value information as a false representation of the *existing* market value of Keystone's residuals.

a sophisticated financial institution and thus should have known better than to rely on the representations at issue.

Bakkebo's contention on this issue — that Keystone was so sophisticated it should have detected the fraud scheme from the outset, and that the jury was obliged so to find from the evidence — simply strains credulity. The evidence at trial was that Keystone was a small, local bank that had, before its encounter with Melgar and Bakkebo, engaged in a traditional business of accepting deposits and lending money out to the community. None of its officers had experience with loan securitization. Its board of directors consisted of businessmen and professionals from the area around Keystone, in southern West Virginia's coal country, who were also unfamiliar with the exotic financial enterprise that Melgar urged the Bank to pursue. Melgar, on the other hand, held himself out as an expert on loan securitization, and was sufficiently convincing in that role that he persuaded Wall Street financial experts such as Conti and Lehman Brothers to participate in Keystone's securitization program. Presented with such evidence, the jury certainly was warranted in concluding that Keystone's reliance on Bakkebo and Melgar's representations was justified. The district court did not err in so ruling.[8]

E.

Finally, we consider Bakkebo's assertion that the district court should have ordered a new trial or a remittitur, because the jury's

---

[8]Under the heading for this contention in his brief, Bakkebo also asserts that Keystone continued to lose substantial sums after it ceased to deal with Melgar, and ultimately failed three years after that time. This assertion, however, does not relate to the question of whether Keystone's reliance was justified. Rather, Bakkebo's contention on the timing of Keystone's collapse appears to address the causal connection between the Bank's collapse and the fraud scheme of which he was a part. As we have already explained, the FDIC's theory of the case was based on the losses Keystone suffered from the 1995-96 loan securitizations and the purchase of Prime — not on the much larger losses that resulted from the Bank's eventual failure, or on the losses that occurred in 1997 through 1999. Accordingly, Bakkebo's observations regarding Keystone's post-1996 losses and collapse are misplaced.

award of damages was against the great weight of the evidence. In this regard, Bakkebo does not challenge the testimony of Potter (the FDIC's damages expert) that the damages from Keystone's 1995-96 loan securitizations and its purchase of Prime totalled approximately $161 million. Rather, he maintains that only a small part of those damages were caused by him.

Bakkebo contends that his actions were not the cause of Keystone's ultimate collapse, and that there was consequently no basis for the damages that were awarded against him. Bakkebo's assertion in this regard is inapposite. The FDIC's claims against Bakkebo were not premised on the collapse of the Bank, the losses from which totalled approximately $660 million. Rather, the FDIC asserted damages that were the sum of Keystone's negative cash flow from seven specific transactions: the six 1995-96 loan securitizations, plus the purchase of Prime. The FDIC presented ample evidence, including the expert testimony of its forensic accountant, that these particular losses were caused by the actions of Bakkebo and his co-conspirators — and Bakkebo, conspicuously, offered no evidence to the contrary. Accordingly, the district court did not err in concluding that the jury's award of damages was warranted by the evidence, and in denying Bakkebo's motion for a new trial or a remittitur on that basis.

IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*