**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-1115**
_____

NANCY MORRIS, as personal representative of the Estate of
David Allan Woods,

        Plaintiff - Appellee,

       v.

ANDREW J. BLAND; RICHARD T. BURKHOLDER, SGT, officially and
individually; LEEMON E. CARNER, PFC, officially and
individually; JERRY SPEISSEGGER, JR., PFC, officially and
individually; PRISCILLA GARRETT, SGT, officially and
individually,

        Defendants – Appellants,

       and

THE HOPE CLINIC, LLC; TEMISAN ETIKERENTSE; SUE BRABHAM,
R.N., officially and individually; H. WAYNE DEWITT, Berkeley
County Sheriff, officially and individually; JAMES M.
BROPHY, PFC, officially and individually; PATRICIA D.
COLLINS, SGT, officially and individually; CHARLES A.
DESANTO, CPL, officially and individually; ASHLEY A. HARBER,
PFC, officially and individually; KANSAS DAAB, PFC,
officially and individually; JOHN DOES, officially and
individually; CLIFFORD L. MCELVOGUE, Director, officially
and individually; BERKELEY COUNTY; BERKELEY COUNTY SHERIFF'S
DEPARTMENT; KENDRA MOORE, Staff SGT, officially and
individually,

        Defendants.

_____

Appeal from the United States District Court for the District of
South Carolina, at Orangeburg.   Richard M. Gergel, District
Judge.   (5:12-cv-03177-RMG)

_____

Argued:  September 20, 2016          Decided:  November 16, 2016

_____

Before TRAXLER and DUNCAN, Circuit Judges, and DAVIS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED**: Harold C. Staley, Jr., ELROD POPE LAW FIRM, Rock Hill, South Carolina, for Appellee.  **ON BRIEF**: Eugene P. Corrigan, III, Amanda K. Dudgeon, CORRIGAN & CHANDLER LLC, Charleston, South Carolina; James A. Stuckey, Jr., Alissa C. Lietzow, STUCKEY LAW OFFICES, LLC, Charleston, South Carolina, for Appellants.  Garrett B. Johnson, ELROD POPE LAW FIRM, Rock Hill, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This appeal arises from a plaintiffs' verdict in connection with the death of David Allan Woods during his incarceration at the Hill-Finklea Detention Center ("HFDC") in South Carolina. The jury awarded substantial damages based on its finding that Andrew J. Bland, Richard T. Burkholder, Leemon Carner, Priscilla Garrett, and Jerry Speissegger, Jr. (collectively, "Appellants"), five HFDC employees present during the final weekend of Woods's incarceration, had been deliberately indifferent to Woods's serious medical needs, and thereby deprived him of rights guaranteed by the Eighth and Fourteenth Amendments. On appeal, Appellants challenge various evidentiary rulings, the punitive damages award, the setoff calculation, and the denial of several post-trial motions. Finding no error, we affirm.*

I.

We detail the facts in the light most favorable to the jury's findings and conclusions. David Allan Woods, then 50 years old, was incarcerated at HFDC from October 12 to November 8, 2010. At the time of Woods's incarceration, HFDC had contracted with Hope Clinic, LLC to provide medical services to

---

* Although counsel for Appellants did not appear for oral argument in this case, we have fully considered the arguments set forth in the brief filed on their behalf.

3

inmates. Medical personnel did not generally work onsite after 5 p.m., before 9 a.m., or over the weekend. Accordingly, if a medical issue arose after hours, a shift sergeant was responsible for alerting on-call medical staff.

At approximately 10:30 p.m. on Friday, November 5, 2010, in response to a call from the central tower, Shift Sergeant Garrett found Woods shaking on the floor of his cell. Garrett asked Woods what was wrong, if he could walk, and if he could stand up. Woods responded "I don't know" to each question. J.A. 487–88. Garrett helped Woods to his feet and directed him to a cell in M-Pod, a medical observation unit with cameras that fed to the front control station. Privates were assigned to the front desk and were responsible for monitoring the video feed during four-hour shifts.

Once in his M-Pod cell, Woods was unsteady on his feet and needed assistance from his new cell mate, Freeman Ingraham, when taking off his uniform, sitting on the toilet, and drinking water from a cup. On several occasions, Ingraham attempted to contact the front desk through the intercom system. When Garrett returned to the cell, Ingraham informed her that he believed he saw blood in Woods's stool. Because Woods and Ingraham had flushed the toilet, Garrett was unable to verify the presence of blood.

4

At 4:28 a.m. on Saturday, November 6, Speissegger entered the cell to administer Woods's medication. Woods did not respond when asked if he would take his medication. Woods's hands were visibly shaking and, despite instructions from both Speissegger and Ingraham, Woods was unable to cup his hand to accept the medication. After the medication fell to the ground, Speissegger left and noted in his log that Woods had refused the medication.

At 5:30 a.m., Burkholder relieved Garrett as shift sergeant. Garrett notified Burkholder of Ingraham's report of blood in Woods's stool, but Burkholder did not call the nurse or attempt to observe any continued presence of blood. Burkholder testified that he visited Woods once during this shift, during which he "saw [Woods] walking" and believed Woods "was fine." J.A. 634.

The record contains several clips of Woods taken during Burkholder's shift. In one, Woods stands swaying in the middle of his cell before falling backward onto his bunk. In another, Woods is lying on his bunk with a dark substance covering the lower half of his uniform and bed. Burkholder noted in his log that Woods was "lying in his own feces and refused to shower." J.A. 650, 1165-66. Garrett returned to duty at 5:30 p.m., and she received and read the above log entry. Another video clip

5

from approximately 12:20 a.m. on Sunday, November 7, shows that Woods's condition remained unchanged.

At approximately 12:30 a.m. on November 7, Garrett arranged for a work crew, including Carner and Speissegger, to clean Woods's cell and escort Woods to the showers. Carner testified that Woods stood, walked, undressed, and bathed without assistance. However, Garrett observed that Woods's uniform was soiled with a dark, black, and hardened substance, and she noticed he was shaking, disoriented, and unsteady. Approximately 30 minutes after he returned to his cell, Woods appeared disoriented and struggled to put on his uniform. Three hours later, when Carner brought Woods his breakfast, Woods was lying naked on the floor. Woods was disoriented, shivering, and barely able to stand, and he required assistance when putting on his uniform. Carner believed that Woods's symptoms were the result of waking up on the cold floor, not from any need for medical attention.

Garrett and Burkholder changed shifts at approximately 5:30 a.m., at which point Garrett told Burkholder he may want to call the nurse to treat Woods. Burkholder responded that he would contact the nurse later on in his shift, but he did not do so. At approximately 6:00 a.m., another HFDC employee, James Brophy, interacted with Woods. Brophy noticed that Woods had wet himself, and he and another officer assisted Woods in changing

6

his uniform. Brophy prepared a written incident report wherein he noted that Woods was disoriented, was "not able to stand but for a short period of time," "did not respond to any question asked [of] him," and "didn't know where he was or why he was here." J.A. 597-98, 1171. The incident report was ultimately passed to Burkholder. Burkholder testified that when he checked on Woods, Woods "was up walking around, coherent, [and] talking," and Burkholder believed "[t]here was nothing wrong with Mr. Woods at that time." J.A. 659. Burkholder did not call the nurse, but he copied the incident report and left it for superior officers and medical staff to receive on Monday morning.

At 5:30 p.m. on Sunday, November 7, Burkholder and Garrett again changed shifts. Garrett checked on Woods shortly after 6 p.m. and found him sitting naked in his cell. She asked Woods to put on his uniform to avoid the cold, and she asked if Woods was in pain or had any complaints. Woods responded to all her questions with grunts. Garrett testified that she believed Woods was being "defiant," though she admitted having no knowledge of any past, uncooperative behavior from Woods. J.A. 504-05.

At 10:19 p.m., Bland was at the front desk and observed Woods lying naked on the cell floor. Through the intercom, Bland instructed Woods to get dressed. Woods stood up, walked

7

to the uniform lying on his bunk, and urinated onto it. Woods then stood, trembling violently, as he held onto the wall for support. At 2:15 a.m. on Monday, November 8, Bland entered Woods's cell to give him his medication. Woods was again unable to properly cup his hand, and Bland noted in his log that Woods had refused his medication. Bland testified that he believed Woods was being "difficult." J.A. 729, 737.

After a new sergeant came on duty on Monday, November 8, the staff nurse was called to examine Woods. Woods was then released with his sentence time-served and was transported to Trident Medical Center, where he was found to be "stuporous" and "hypotensive" with "a hemoglobin of 4." J.A. 450-51, 1257. Woods's "prognosis was felt to be bleak" when he was admitted. J.A. 1258. Woods then underwent several procedures to address bleeding ulcers in his duodenum. Woods suffered a cardiac arrest during the first procedure, but he was resuscitated. On November 11, 2010, Woods suffered another major intestinal bleed above his stomach. Woods passed away at 4:50 p.m. on November 11, 2010. An autopsy revealed his cause of death as gastrointestinal bleeding from a duodenal ulcer, bleeding esophageal ulcers, cirrhosis of the liver with esophageal varices, and cardiac arrest secondary to gastrointestinal bleeding.

Appellee Nancy Morris, as personal representative of Woods's estate, filed this survival and wrongful death action pursuant to 42 U.S.C. § 1983. Morris filed the action against eighteen defendants: the Hope Clinic and two of its employees (collectively, the "Hope Defendants"), as well as Appellants, Berkeley County, its Sheriff's Office, and eight other county employees (collectively, the "County Defendants"). Prior to trial, the district court approved a settlement reached by Morris and the Hope Defendants. Ten of the County Defendants were also dismissed voluntarily or by summary judgment. The case then proceeded to trial only on Morris's deliberate indifference claim against Appellants. During trial, the parties were limited to presenting evidence that related to the period between November 5 and 8, 2010, when Appellants' deliberate indifference allegedly occurred. The district court also prohibited Appellants from introducing evidence regarding the Hope Defendants, the settlement, their prior treatment of Woods, or Woods's history of alcohol use.

The jury determined that Appellants had been deliberately indifferent to Woods's serious medical needs during his last weekend of incarceration. The jury awarded compensatory damages of $500,000 jointly, punitive damages of $150,000 each against Bland, Carner, and Speissegger, and punitive damages of $1,000,000 each against Burkholder and Garrett. The district

9

court then resolved a number of post-trial motions filed by Appellants. The district court denied Appellants' motions for judgment as a matter of law, new trial, and remittitur. However, it granted in part Appellants' motion for setoff and, upon applying portions of the Hope settlement proceeds, reduced the compensatory damages award to $171,875. Appellants timely appealed. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We begin by addressing Appellants' various evidentiary challenges. This Court reviews the district court's rulings on the admissibility of evidence for abuse of discretion. Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 349 (4th Cir. 2014) (citation omitted).

Appellants first argue that the district court improperly excluded evidence related to the Hope Defendants, the settlement, and their treatment of Woods before November 5, 2010. Appellants contend this evidence is relevant to determining causation and the subjective state of mind required for deliberate indifference. However, the district court correctly noted that the central dispute at trial was whether Woods's need for medical treatment over his last weekend of incarceration was obvious to a layperson such that Appellants should have reported his symptoms to medical personnel.

Appellants repeatedly testified they had no knowledge of Woods's medical history. Nor did they provide any evidence to suggest they relied on the Hope Defendants' treatment history when they observed and failed to adequately respond to Woods's deteriorating health over the November 5-8 period. Given these considerations, we agree that the Hope Defendants' role or alleged negligence in treating Woods before this period was irrelevant to the deliberate indifference claim. See, e.g., Cooper v. Dyke, 814 F.2d 941, 947 (4th Cir. 1987) (holding that the paramedics' negligence "could not have constituted an 'intervening' cause" where the plaintiff's "claim was based on defendants' deliberate indifference to his . . . suffering after the time of the initial paramedic exam."). Accordingly, the district court did not abuse its discretion in excluding the aforementioned evidence.

Appellants also contend that the district court improperly excluded evidence of Woods's alcohol and drug use as well as its impact on his medical condition. However, Appellants provide nothing but mere speculation when they argue that Woods's use of alcohol and drugs "accelerat[ed]" the deterioration of his health such that "no act or omission by Appellants proximately caused his death." Appellants' Br. 48. Given the likely prejudicial effect of such evidence, and given Appellants' failure to articulate the relevance or probative value of this

11

evidence, we find no abuse of discretion in its exclusion under Federal Rule of Evidence 403.

Finally, Appellants argue that the district court erred when it "prohibited" Appellants from soliciting expert testimony from Morris's qualified medical expert, Dr. Jack Raba, as well as Appellants' two fact witnesses. Appellants' Br. 44. Contrary to their assertion, Appellants were permitted wide latitude to vigorously cross-examine Dr. Raba regarding his testimony, especially as it pertained to causation. We therefore discern no abuse of discretion as to this expert testimony.

We similarly find no abuse of discretion as to the examination of Appellants' two fact witnesses, Dr. John Sanders and Dr. Ellen Reimers. Dr. Sanders was Woods's treating physician before and after his incarceration at HFDC, and Dr. Reimers was the pathologist who conducted Woods's autopsy. Notably, however, neither witness prepared an expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). Numerous courts have held that a physician is exempt from this written report requirement only as to opinions formed during the course of treatment. See, e.g., Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 824-26 (9th Cir. 2011) (collecting cases). Here, both Dr. Sanders and Dr. Reimers were fully permitted to discuss their examination of Woods and their

12

diagnoses or findings. Their testimony was disallowed only to the extent Appellants sought to "offer [expert] opinions as to proximate cause" that were not formed during the course of treatment and thereby fell outside the scope of their opinions as mere fact witnesses. J.A. 380; see Fed. R. Evid. 701. Under Federal Rule of Civil Procedure 37(c)(1), a party who fails to provide information as required by Rule 26(a), including a Rule 26(A)(2)(B) expert report, is subsequently "not allowed to use that information . . . at a trial" and may be sanctioned for this failure. Fed. R. Civ. P. 37(c)(1). Accordingly, the district court did not abuse its discretion in excluding the above testimony from Dr. Sanders and Dr. Reimers.

## III.

Appellants next contend that Morris failed to provide adequate evidence to support the jury's finding of deliberate indifference and, as a result, the district court erred in denying their Rule 50(b) motion for judgment as a matter of law and their Rule 59(a) motion for a new trial. We review de novo the denial of a Rule 50(b) motion. Durham v. Jones, 737 F.3d 291, 298 (4th Cir. 2013) (citation omitted). "If, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in [the non-moving party's] favor, we are constrained to affirm the jury verdict." First Union Commercial Corp. v. GATX Capital

13

<u>Corp.</u>, 411 F.3d 551, 556 (4th Cir. 2005) (alteration in original) (quoting <u>Lack v. Wal-Mart Stores</u>, 240 F.3d 255, 259 (4th Cir. 2001)). The denial of a Rule 59(a) motion is reviewed for abuse of discretion, and it "will not be reversed 'save in the most exceptional circumstances.'" <u>FDIC v. Bakkebo</u>, 506 F.3d 286, 294 (4th Cir. 2007) (quoting <u>Figg v. Schroeder</u>, 312 F.3d 625, 641 (4th Cir. 2002)).

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must establish both a subjective and an objective component to her claim. <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). "The plaintiff must demonstrate that the [prison] officers acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." <u>Id.</u> (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Id.</u> (quoting <u>Henderson v. Sheahan</u>, 196 F.3d 839, 846 (7th Cir. 1999)). To satisfy the subjective component, the plaintiff must demonstrate that the officer had "actual knowledge of the risk of harm to the inmate" <u>and</u> that the officer "recognized that his actions were insufficient to mitigate the risk of harm . . . arising from [the inmate's] medical needs." <u>Id.</u> (internal quotation marks, citations, and

14

emphasis omitted). Whether an officer "had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer v. Brennan, 511 U.S. 825, 842 (1994) (citations omitted).

Upon viewing the trial testimony and evidence provided by the parties, we find that the evidence supports the jury's finding of a serious medical need. The videos of Woods's conditions, Ingraham's recognition of Woods's need for medical attention, and Brophy's testimony and incident report suggest that Woods's medical need was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (citation omitted). There is also ample circumstantial evidence to support the subjective component of this claim. Based on the obviousness of an inmate's medical need, a jury is permitted to conclude that the prison officers knew of the risk of harm to the inmate. Farmer, 511 U.S. at 842. Moreover, "a factfinder may conclude that the official's response . . . was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004). As described, testified to, and captured in the record, the obviousness of Woods's medical need and Appellants'

15

inadequate reactions to Woods's symptoms amply support the jury's finding of deliberate indifference. Accordingly, we discern no error in the district court's denial of Appellants' motions for relief under Rule 50(b) and Rule 59(a).

IV.

Appellants next challenge the jury's punitive damages award. Appellants contend that the evidence did not support a finding of punitive damages under 42 U.S.C. § 1983, that the punitive damages award was unconstitutionally excessive, and that the awards against Garrett and Burkholder — which were almost seven times the awards against the remaining Appellants — indicate the jury erred by holding the shift sergeants liable for the conduct of their subordinates. Appellants seek review of the denials of their 50(b) motion for judgment as a matter of law, motion for remittitur, and 59(a) motion for new trial on the above bases.

We review de novo the denial of a 50(b) motion on a punitive damages award, and we review de novo the denial of a motion for remittitur on a punitive damages award alleged to be constitutionally excessive. EEOC v. Fed. Express Corp., 513 F.3d 360, 370-71 (4th Cir. 2008) (citations omitted). We review the denial of a 59(a) motion for abuse of discretion. Gregg v. Ham, 678 F.3d 333, 342-43 (4th Cir. 2012) (citation omitted).

16

Punitive damages are available in § 1983 actions "for conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). Based on the record before us, we conclude that Appellants' deliberate indifference to Woods's serious medical needs satisfies the requirement that their conduct involve reckless or callous indifference to Woods's federally-protected rights. See id. (finding that the "callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the § 1983 claim" for inadequate medical care).

Moreover, we do not find the punitive damages award to be constitutionally excessive. Contrary to Appellants' contentions, the factors enumerated by the Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and State Farm Mutual Auto Insurance Co. v. Campbell, 538 U.S. 408 (2003), support the jury's punitive damages award. First, given Appellants' repeated and deliberate indifference over a three-day period, Woods's physical vulnerability, and Woods's resulting physical harm, we find that Appellants' misconduct was sufficiently "reprehensible as to warrant the imposition of further sanctions [beyond compensatory damages] to achieve

17

punishment or deterrence." <u>Campbell</u>, 538 U.S. at 419 (citation omitted). Second, the total punitive damages award is approximately five times the compensatory damages award, and single digit ratios generally do not present a constitutional issue. <u>Id.</u> at 425. Appellants emphasize that the individual punitive awards against Burkholder and Garrett reflect a 10-to-1 ratio, but a high ratio may nonetheless "comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" <u>Id.</u> (citation omitted). Here, the compensatory damages award was deflated due to Woods's lack of lost wages. Based on the facts of this case, we "will not use the low economic damages award to limit a punitive damages award that was otherwise justified by the reprehensibility of [Appellants'] behavior." <u>Siggers-El v. Barlow</u>, 433 F.Supp.2d 811, 819 (E.D. Mich. 2006). Third, we note that the punitive damages award in this case is not inconsistent with similar deliberate indifference cases. <u>See, e.g.</u>, <u>Murphy v. Gilman</u>, 551 F. Supp. 2d 677, 685-86 (W.D. Mich. 2008) (upholding a punitive damages award of $1.25 million against each prison officer defendant for deliberate indifference over a five-day period during which an inmate received no medical care and little food and water, resulting in his death).

Finally, we find Appellants' argument regarding supervisory liability to be without merit. The evidence supports a finding that Burkholder and Garrett were more culpable than Bland, Speissegger, and Carner in their deliberate indifference to Woods's serious medical needs. Thus, the record in this case supports Burkholder and Garrett's larger share of the punitive damages award. We therefore discern no error in the punitive damages award or in the district court's denial of Appellants' post-trial motions.

V.

Finally, Appellants challenge the district court's calculation of the setoff amount. A district court's decision to set off a damage award is reviewed for clear error. Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 596 (4th Cir. 1996) (citations omitted).

"[S]tate law governs the substantive right to setoff." Id. Under South Carolina law, "[a] non-settling defendant is entitled to credit for the amount paid by another defendant who settles for the same cause of action." Rutland v. S.C. Dep't of Transp., 734 S.E.2d 142, 145 (S.C. 2012) (citation omitted). Here, given that Morris's settlement with the Hope Defendants divided the settlement proceeds 50/50 between the survival and wrongful death claims, the district court applied the same division with respect to the jury's § 1983 verdict. Because

19

Woods could experience only one wrongful death, the court fully offset the $250,000 of the jury verdict attributable to wrongful death. The district court then considered the survival portion of Morris's claims. The court observed that the Hope Defendants interacted with Woods over 29 days whereas Appellants' interactions were limited to Woods's last four days of incarceration, which amounted to only 14% of the settlement time period. However, the district court also noted that Woods experienced more pain and suffering during his last weekend of incarceration. Accordingly, the court allocated 25% of the survival settlement proceeds to the survival portion of the jury verdict. This determination resulted in a total setoff of $328,125.

The above calculation is reasonably based on the evidence and fairly advances the policy of preventing double recovery. Accordingly, we discern no clear error or abuse of discretion in the district court's calculation.

VI.

For the foregoing reasons, the judgment is

AFFIRMED.