**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 08-2031**

───────────

TAMMY L. CALEF,

Plaintiff – Appellee,

v.

FEDEX GROUND PACKAGING SYSTEM, INCORPORATED,

Defendant - Appellant.

───────────

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.   Irene M. Keeley, District Judge.   (1:06-cv-00047-IMK-JSK)

───────────

Argued: May 14, 2009                    Decided: August 27, 2009

───────────

Before MICHAEL, KING, and GREGORY, Circuit Judges.

───────────

Affirmed by unpublished opinion.   Judge King wrote the opinion, in which Judge Michael and Judge Gregory joined.

───────────

**ARGUED:**   John J. Myers, ECKERT, SEAMANS, CHERIN & MELLOTT, Pittsburgh, Pennsylvania, for Appellant.  Georgia Lee Gates, LAW OFFICES OF RON L. TUCKER, Fairmont, West Virginia, for Appellee. **ON BRIEF:** Christina I. Kepplinger, ECKERT, SEAMANS, CHERIN & MELLOTT, Pittsburgh, Pennsylvania, for Appellant.

───────────

Unpublished opinions are not binding precedent in this circuit.

KING, Circuit Judge:

Tammy L. Calef asserted and pursued a disability discrimination claim under the West Virginia Human Rights Act, W. Va. Code §§ 5-11-1 to -21 (the "WVHRA"), against her employer, FedEx Ground Packaging System, Incorporated ("FedEx"). In early 2008, at the conclusion of a trial in the Northern District of West Virginia, the jury returned a verdict in favor of Calef. Thereafter, the district court awarded her more than $1.2 million in damages, prejudgment interest, attorney fees, and litigation expenses. In this appeal, FedEx raises nearly twenty contentions of error, seeking to have the judgment reversed. As explained below, we reject each of these contentions and affirm.


I.

A.

According to the trial evidence, Calef had been an employee of FedEx and its predecessors in Clarksburg, West Virginia, since 1994.[1] On January 23, 2004, Calef was laterally transferred between positions — from Dock Service Manager to

---

[1] Our statement of the facts summarizes the evidence on the disability discrimination claim in the light most favorable to Calef, as the prevailing party. See ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 113 (4th Cir. 2006).

Package and Delivery ("P&D") Service Manager — at the Clarksburg home delivery terminal. In her new role as P&D Service Manager, Calef was responsible for overseeing the work of the independent contractors who delivered packages for FedEx.[2] The work week at the terminal ran from Tuesday to Saturday.

Calef's first day as P&D Service Manager was scheduled for Tuesday, January 27, 2004. The prior Saturday, Calef injured her left hand while playing volleyball. Calef visited a doctor on Monday and, believing her injury was nonserious, reported for work on Tuesday. Upon arrival at the Clarksburg terminal that morning, she showed her hand injury to Dock Service Manager Chris Davis, with whom she had just switched positions. Calef's immediate supervisor, Terminal Manager Kyle Ryan, was aware of Calef's hand injury by at least Thursday, January 29. Each day from January 27 to 29, Calef planned to engage in nonphysical P&D Service Manager duties, such as ride-alongs with delivery

---

[2] Specific duties of the P&D Service Manager, as outlined in a January 23, 2004 performance expectation plan provided to Calef by FedEx, included the following: riding twice a week with contractors, completing related reports, and reviewing the reports with the contractors involved; timely completing accident reports and post-accident rides; completing an audit of each contractor once every quarter, reviewing the audits with the contractors, and submitting related reports to the FedEx Terminal Manager; completing daily van service audits for all drivers and reviewing the results with the Terminal Manager; and "other duties and functions as assigned by Senior Management." J.A. 1560. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

3

drivers, but she was instead scheduled by upper-level supervisors to drive a van and deliver packages. On January 29, with her hand injury having worsened, Calef returned to the doctor and was fitted with a finger splint. Despite the increased severity of her injury, FedEx continued to assign Calef to delivery duties.

Around February 6, 2004 — as she was preparing for yet another day of delivering packages — Calef was approached by Steve Hickman, FedEx's Regional Human Resources Manager. Hickman asked Calef if she had been "sending out resumes" and expressed an assumption that she was "looking for another job." J.A. 1085. When Calef responded that she was not seeking another job and was "planning on retiring with FedEx," Hickman offered Calef a three-month severance package to entice her to resign. Id. Calef refused the offer, prompting Hickman to sweeten the deal with "medical till the end of the year." Id. Calef yet rejected Hickman's offer, at which point he told her that "this is just between you and me." Id. Troubled by this exchange with Hickman, Calef sought an explanation from Ryan. Ryan acknowledged that he already knew from Hickman about the offer, which left Calef confused because "[Hickman was] saying it's just between you and me but he had already discussed it with [Ryan]." Id. at 1086. For the week thereafter, Ryan sent

4

daily notes to Hickman, documenting problems with Calef's performance that were unrelated to her hand injury.

On Friday, February 13, 2004, Calef was assigned a delivery route with more than seventy stops. That day or the next, with her injured hand throbbing, Calef went to Ryan and told him that "[m]y hand cannot do this." J.A. 1091-92. Ryan, following company protocol, requested a doctor's excuse. On Monday, February 16 — in compliance with Ryan's request — Calef visited and obtained excuses from both her doctor and her chiropractor. Calef's doctor wrote that Calef had "[l]imited use of [her left] hand" and that she should not "lift[] [more than] 20 lbs." until March 1. Id. at 1785. The chiropractor implied that Calef's injury had been prolonged by improper use of her hand, writing that "[d]ue to repeated extension of the second and third metacarpal, the pain . . . has not decreased." Id. at 1786. He further concluded that Calef was "limited on her ability to drive," and that "[l]imiting the amount of driving would greatly improve her condition whereas driving frequently could cause her condition to worsen." Id. Significantly, neither the doctor nor the chiropractor suggested that Calef could not, or even should not, work. Calef presented the two excuses to Ryan on Tuesday, February 17, and was permitted to perform non-delivery P&D Service Manager duties on February 17 and 18.

After complying with FedEx's directive to again deliver packages on Thursday, February 19, 2004, Calef's hand became "green, swollen, throbbing." J.A. 1094. She was unable to sleep that night because of the pain, and she called Davis the next morning to inform him that she would be unable to deliver packages that day. Calef reported for work that morning and then left for an afternoon doctor's appointment, during which the doctor placed Calef's hand in a half-cast to immobilize her injury. The doctor again wrote a note to FedEx, recommending "[n]o use [of Calef's left] Arm" until March 20. Id. at 1787. Upon returning to work after her doctor's appointment, Calef completed two handwritten reports. Although she is left-handed, Calef managed to complete the reports with her right hand. The next day, Calef rode with and trained a new driver.

Having not missed a single work day because of her January 24, 2004 hand injury, Calef again reported to work on Tuesday, February 24. That day, as she was preparing to leave on a ride-along with a temporary driver, Calef was abruptly summoned back to the terminal — Hickman was on the phone and wished to speak with her. Hickman ordered Calef to "go home," file a claim for short-term disability benefits, and stay away from work until either he or Ryan called with additional instructions. J.A. 1101. Calef was stunned by these commands, maintaining that she was "fulfilling everything" expected of her as a P&D Service

Manager. Id. Hickman's own notes of the call reflect that Calef "questioned why she was being sent home," and that Hickman responded by asserting "that the Company needed to assess her ability to do her job based on the restrictions imposed by her doctors." Id. at 1521.

Hickman partially filled out — but never completed — a "Reasonable Accommodation Checklist" to determine whether Calef had a "disability that may need to be reasonably accommodated." J.A. 1522. The author of the checklist was a FedEx equal employment opportunity ("EEO") official, Carolyn Lyle, who had been promoted to Senior Manager of Diversity and EEO by the time Hickman ordered Calef to take disability leave. According to Lyle, Hickman violated FedEx's reasonable accommodation process by failing to explore whether Calef could remain on the job with accommodation. For example, while Calef had suggested ways that she could continue to work with her injured hand, "her suggestions weren't discussed as to whether or not they were reasonable." Id. at 996. Lyle's trial testimony indicated that Hickman prematurely stopped the reasonable accommodation process and arbitrarily required Calef to go on leave.

After leaving the Clarksburg terminal on February 24, 2004, Calef dutifully complied with Hickman's instructions by applying for short-term disability benefits. But Calef's position had not changed — she informed the benefits plan administrator that

7

"FedEx [was] the one . . . doing this," and that "[she] was doing [her] job" and "did not ask for [disability leave]." J.A. 1102. Calef was approved for short-term disability benefits on March 8.

Though Hickman and Ryan made no attempt to follow up with her, Calef repeatedly contacted Ryan between mid-March and early May 2004. On those occasions when she reached Ryan, Calef expressed her desire to return to work. On May 11, Hickman advised Ryan that Calef was "not to return to work without first submitting a <u>full</u> release from her doctor." J.A. 1524 (emphasis added). That same day, Hickman sent a letter to Calef in which he acknowledged that Calef's doctor had estimated a return-to-work date of May 23, but also suggested that Calef might be eligible for long-term disability benefits once her short-term benefits expired after twenty-six weeks. <u>Id.</u> at 1525. Unable to obtain a "full" release because of the ongoing twenty-pound lifting restriction — and thus unable to return to work — Calef applied and was approved for long-term disability benefits.

Meanwhile, Calef "contacted everybody [she] knew" within FedEx to inquire about how she could return to work at the Clarksburg home delivery terminal and whether there were any job openings at other FedEx facilities. J.A. 1113. After "hitting walls everywhere," Calef contacted Lyle, who at the time was still FedEx's Senior Manager of Diversity and EEO. <u>Id.</u> at 1115.

8

Lyle agreed to investigate the situation, but she left FedEx before her inquiry was complete. FedEx referred the matter to other human resources officials, but Calef was informed by email on January 18, 2006, that FedEx was "unable to assist [her] in reviewing employment opportunities" absent a medical release relating to the twenty-pound lifting restriction. Id. at 1609. By that time, as a result of physical therapy, Calef was approved by her doctors to lift up to fifteen pounds — short of FedEx's requirement for her return to work.

Calef's efforts to find employment had not been limited to FedEx. Indeed, Calef — a forty-something single mother who had enjoyed a $50,000 FedEx salary (plus incentive pay and benefits) — found herself forced to survive on finite disability benefits equaling only a fraction of her salary. She applied for a plethora of jobs, and was finally hired by an Old Navy clothing store as a part-time customer service representative. As other sources of income, Calef continued to run a company that she founded in 1992 to teach volleyball to girls. She even covered volleyball games for a local newspaper, made purses to sell, and took a "hardship withdrawal" from a FedEx retirement account. In 2006, Calef was accepted to law school, from which she was expected to earn her juris doctor degree in May 2009. While attending law school, Calef subsisted largely on student loans, but also held part-time positions as a student representative

for a law book publisher and as a law firm intern. By the time of trial, Calef had earned only $5817, excluding disability benefits, since being forced by FedEx to take disability leave. She had an offer of post-law school employment, conditioned on her being admitted to practice as a lawyer, at an annual salary of $42,000.

Calef described her treatment by FedEx as being akin to "a divorce." J.A. 1142. At trial — years after she was forced by FedEx to take disability leave — she described the experience as follows:

> Imagine being in a family for almost ten years and then they tell you they don't want you anymore. I loved my job. I loved working for FedEx. I had made a determination that this is [where] I was going to retire . . . . I saw FedEx employees more than I saw my family and I did everything that they wanted me to do and [then] I'm injured. I'm still doing my job [but] they're telling me go home. Go home until you hear back from us and then they don't call. . . . And that's it. The door closed.

Id. at 1141-43.

B.

On February 17, 2006, Calef filed suit against FedEx in the Circuit Court of Harrison County, West Virginia, asserting her disability discrimination claim under the WVHRA. FedEx removed

10

the case to the Northern District of West Virginia, invoking diversity jurisdiction under 28 U.S.C. § 1332.[3]

The jury trial on the disability discrimination claim was conducted over four days in January 2008. At the close of Calef's case-in-chief, FedEx moved, pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law. The district court denied the motion, and the case proceeded to the jury. The jury found for Calef on the disability discrimination claim, awarding her a total sum of $808,328 in back pay, front pay, and damages for emotional distress, humiliation, and embarrassment. See Calef v. FedEx Ground Package Sys., Inc., No. 1:06-cv-00047 (N.D. W. Va. Jan. 9, 2008) (the "Judgment Order").[4]

Post-trial, FedEx renewed its Rule 50 motion for judgment as a matter of law, and alternatively moved under Rule 59 for a new trial. Calef also persisted, seeking prejudgment interest, attorney fees, and litigation expenses. By order of August 14, 2008, the district court denied FedEx's request for judgment as

---

[3] Calef also asserted a WVHRA sex discrimination claim against FedEx, based on a pre-injury demotion she had received in October 2003. Prior to trial, the district court awarded summary judgment to FedEx on the sex discrimination claim, because it was time-barred. The court then barred discussion of the sex discrimination claim at trial.

[4] The Judgment Order is found at J.A. 194-98.

a matter of law or a new trial.  See Calef v. FedEx Ground Package Sys., Inc., No. 1:06-cv-00047 (N.D. W. Va. Aug. 14, 2008) (the "Post-trial Order").[5]  The court ruled in its Post-trial Order that Calef was entitled to the full amount of damages specified by the jury.  Thereafter, by separate orders, the court awarded Calef $106,286 in prejudgment interest, $273,596 in attorney fees, and $33,731 in litigation expenses. The total award to Calef was $1,221,941.

FedEx timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Before turning to our assessment of FedEx's more narrow appellate contentions, we find it helpful to paint a broader picture of the applicable principles of West Virginia law, as well as Calef's theory of disability discrimination and its presentation to the jury.  Notably, our focus is on the WVHRA, which those familiar with federal discrimination law will recognize as often corresponding with — but sometimes straying from — the Americans with Disabilities Act (the "ADA").  See Stone v. St. Joseph's Hosp. of Parkersburg, 538 S.E.2d 389, 404 (W. Va. 2000) ("[T]he West Virginia Human Rights Act, as created

---

[5] The Post-trial Order is found at J.A. 433-95.

12

by our Legislature and as applied by our courts and administrative agencies, represents an independent approach to the law of disability discrimination that is not mechanically tied to federal disability discrimination jurisprudence.").

A.

Under the WVHRA, it is unlawful "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled." W. Va. Code § 5-11-9(1). "The term 'disability' means," inter alia, "[a] mental or physical impairment which substantially limits one or more of such person's major life activities," including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working," or "[b]eing regarded as having such an impairment." Id. § 5-11-3(m)(1), (3). The Supreme Court of Appeals of West Virginia has recognized that the prohibition against disability discrimination "extends, of course, to the denial of employment opportunities based on vocationally irrelevant disabilities and, thus, embraces the traditional employment discrimination theor[y] of disparate treatment." Skaggs v. Elk Run Coal Co., 479 S.E.2d 561, 573 (W. Va. 1996). The state supreme court has also "inferred that [the WVHRA] imposes [a] duty of reasonable

13

accommodation," i.e., "an affirmative obligation [on employers] to provide reasonable accommodation for disabled individuals." Id. at 574.

In its Stone decision, rendered in 2000, the state supreme court addressed a disability discrimination claim similar in many respects to Calef's claim. Stone, a paramedic on an ambulance crew, had made two reports in one month to his employer, St. Joseph's Hospital, of on-the-job back strains; one of the reports indicated that Stone was taking a narcotic-type pain medication. See Stone, 538 S.E.2d at 393. After reviewing these reports, several Hospital officials met and decided to indefinitely remove Stone from his paramedic duties pending an independent medical examination, and to reassign him for the interim period to an office position as a dispatcher. Id. The Hospital later explained that the transfer decision was predicated on concerns, inter alia, that Stone's condition could worsen, and that his back problem and use of a narcotic-type pain medication could endanger Stone, his co-workers, his patients, and the public. Id. Stone "strongly objected" to his reassignment as a dispatcher, contending that he was able to safely perform his paramedic duties without limitation — a view backed by four doctors. Id. The Hospital refused to reverse its transfer decision, however, and Stone was forced to work as a dispatcher for several months, until he underwent the

14

independent medical examination and was cleared to return to paramedic duties. Id. at 394. In the meantime, Stone had asserted a WVHRA "regarded as" disability discrimination claim against the Hospital, on which a jury ultimately found in Stone's favor.

On appeal to the state supreme court, the Hospital contended that Stone had failed to present sufficient evidence to support his theory that he was a qualified disabled person, that is, that the Hospital regarded him as having a physical impairment that substantially limited the major life activity of working. See Stone, 538 S.E.2d at 406. This was so, according to the Hospital, because it "only 'suspected' the possibility of Mr. Stone having a problem that limited his ability to safely perform the 'single job' of ambulance paramedic." Id. The court rejected the Hospital's contention, however, explaining that "[d]espite what the Hospital said about their subjective view of Mr. Stone, the jury was entitled to look at what the Hospital did." Id. And, as the court observed, the trial evidence reflected that "[t]he Hospital treated Mr. Stone . . . as a person who should not be entrusted with the duties of his regular job." Id. The court concluded that, in the circumstances,

> [t]he limitations or restrictions that the Hospital
> regarded as appropriate for Mr. Stone were certainly
> of sufficient magnitude and breadth — taking him off

15

all of his regular duties and prohibiting him from driving, providing patient care, lifting, and carrying — for a jury to conclude that Mr. Stone was treated as being substantially limited in his major life activity of working.

Id. Importantly, the court observed that the Hospital could not be shielded from liability under the WVHRA based on evidence that Stone believed personal animus against him — unrelated to any perceived disability — played a part in the decision to reassign him. Id. at 407 n.25. The court explained that the WVHRA "protects persons who are discriminatorily treated as having a substantially limiting impairment," and that "[t]his component of the Act's prohibitions is an objective test that does not focus on the subjective motivation behind the behavior in question, but on the behavior itself." Id.

Although the state supreme court concluded that Stone was a qualified disabled person under the WVHRA, the court accepted the Hospital's position that its decision to reassign Stone from paramedic to dispatcher duties was nonetheless permissible. See Stone, 538 S.E.2d at 407. In so doing, the court observed that "the law recognizes the right of an employer to take reasonable job-related precautions in a fashion that is consistent with the duty of reasonable accommodation, while inquiring or obtaining medical information about an employee's fitness for duty." Id. The court concluded that Stone could not prove disability discrimination, because he merely had been subjected to "a

16

temporary transfer to another job at the same rate of pay, and with no long-term or permanent job detriment, pending the outcome of a medical examination that was facially justified." Id. at 408. Accordingly, the court directed entry of judgment for the Hospital. Id.

B.

For obvious reasons, Calef relies on Stone for the proposition that, at the time FedEx forced her to take disability leave, she was a qualified disabled person under the WVHRA. That is, Calef contends that FedEx regarded her — just as St. Joseph's Hospital regarded Stone — to be substantially limited by a physical impairment in the major life activity of working. Indeed, Stone and Calef were each objectively "treated . . . as a person who should not be entrusted with the duties of his [or her] regular job." Stone, 538 S.E.2d at 406. Each claimed, however, to be "able and competent to perform the services required," W. Va. Code § 5-11-9(1), even without accommodation. Where Stone's and Calef's cases diverge is the alleged act of discrimination — that is, the alleged adverse employment action — at issue. While Stone was merely reassigned to a "light-duty" position at the same rate of pay and with no job detriment while awaiting the results of an independent medical examination, Stone, 538 S.E.2d at 397, Calef was forced to "go home" and apply for disability benefits, J.A. 1101, with

17

no sincere effort made by FedEx to evaluate her condition or to return her to work. In Calef's words, FedEx directed her to "[g]o home until you hear back from us and then they [didn't] call. . . . And that's it. The door closed." Id. at 1142-43.

In submitting Calef's "regarded as" disability discrimination claim to the jury, the district court deemed it appropriate to require the jury to answer special interrogatories in keeping with West Virginia's burden-shifting evidentiary regime — a regime similar to that adopted for proof of federal discrimination claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Skaggs, 479 S.E.2d at 582 (recognizing that burden-shifting regime requires plaintiff to establish prima facie case of discrimination, employer to articulate "legitimate, nondiscriminatory reason for its actions," and plaintiff to prove that proffered reason is "mere pretext"). The special interrogatories initially required the jury to make findings on the elements of Calef's prima facie case, by asking, inter alia, the following: whether FedEx "regarded [Calef] as disabled on February 24, 2004"; whether Calef, on that date, "was able and competent to perform the essential functions of the job of [P&D] Service[] Manager"; and whether FedEx "took an adverse employment action against . . . Calef." Judgment Order 1-3 (Interrogatory Nos. 1-2, 5). Each

18

of these interrogatories was answered in favor of Calef.[6] Accordingly, the jury proceeded to Interrogatory No. 6, which asked, "Do you find that [FedEx] articulated a legitimate, non-discriminatory reason for taking its adverse employment action against . . . Calef?" Id. at 3. Because the jury answered "No," it was directed to enter a verdict in favor of Calef. Id. If the jury had answered "Yes," it would have been obliged to answer Interrogatory No. 7, which asked whether FedEx's "articulated reason for its adverse employment action against . . . Calef[] was a pretext for unlawful disability discrimination." Id.

In summary, the jury found that Calef proved a prima facie case of disability discrimination and that FedEx failed to articulate a legitimate, nondiscriminatory reason for its adverse employment action. Thus, the jury entered a verdict for Calef without reaching the issue of whether FedEx's articulated reason was a pretext for discrimination.

---

[6] If the jury had found that Calef was not able and competent to perform the essential functions of her job, it would have been directed to assess whether she could have performed those functions with reasonable accommodation and whether FedEx provided such accommodation. See Judgment Order 2 (Interrogatory Nos. 3-4).

III.

As previously noted, FedEx raises nearly twenty contentions of error in this appeal. Because a discussion of all those contentions would be unwieldy — and because the district court has already engaged in a careful and thorough assessment of each — we focus herein on only the most compelling of FedEx's arguments. As for the other contentions, we are satisfied to rely on the sound judgment of the district court without further comment.

A.

We begin with FedEx's contention that the evidence was insufficient to support the jury's finding that FedEx regarded Calef as disabled. FedEx presented this contention in its unsuccessful motion, made pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law. We review de novo a district court's denial of a Rule 50 motion, viewing the evidence in the light most favorable to the prevailing party and assessing whether there was a legally sufficient evidentiary basis for a reasonable jury to find for that party. See FDIC v. Bakkebo, 506 F.3d 286, 294 (4th Cir. 2007). FedEx asserts two independent grounds to set aside the jury's "regarded as" finding, which we address in turn.

20

1.

First, FedEx maintains that "the jury could not reasonably have found that [FedEx] regarded [Calef] as having anything but a temporary impairment," which cannot amount to a disability under the WVHRA. Br. of Appellant 24. In making this assertion, FedEx relies on a provision of the West Virginia Code of State Rules defining what it means for a physical impairment to substantially limit a major life activity and, thus, constitute a disability. This provision specifies that "[s]ubstantially limits does not include or mean minor temporary ailments or injuries," such as "colds or flu, or sprains or minor injuries." W. Va. Code R. § 77-1-2.5.3; see also Hoops v. Elk Run Coal Co., 95 F. Supp. 2d 612, 618 (S.D. W. Va. 2000) (relying on Code of State Rules definition for conclusion that car accident injuries — including eleven stitches removed one week later and some bruises — were not substantially limiting or perceived as such). Significantly, however, the Code of State Rules excludes only minor temporary impairments from the definition of disability — it does not preclude all temporary impairments from ever being deemed disabling. And, indeed, the Supreme Court of Appeals of West Virginia has explicitly recognized, in its 1999 Haynes v. Rhone-Poulenc, Inc. decision, that a temporary impairment can constitute a disability protected under the WVHRA. See 521 S.E.2d 331 (W. Va. 1999).

21

In Haynes, the state supreme court held that the WVHRA protects "a person who has a disability and is temporarily unable to perform the requirements of the person's job due to [the] disability, with or without accommodation." Haynes, 521 S.E.2d at 344. In such circumstances, the court ruled, the employer may be required to provide the disabled employee a temporary leave of absence as a reasonable accommodation. Id. Importantly for Calef, the Haynes court recognized that the employee may be temporarily unable to work because of a disability resulting from a temporary impairment. Haynes, a chemical laboratory technician for Rhone-Poulenc, was disabled by a "high-risk pregnancy, complicated by medical conditions." Id. at 337. In discussing Haynes's status as a qualified disabled person, the court emphasized that,

> in the context of this case, by disabling condition, we refer to a totally disabling medical condition of limited duration, so that following a temporary leave of absence for treatment and improvement, it is reasonably foreseeable that the plaintiff is likely to be able to return to work.

Id. at 344 n.17 (emphasis added). Thus, the state supreme court's Haynes decision clearly forecloses FedEx's contention that a temporary impairment cannot constitute a disability under the WVHRA.[7]

---

[7] We are not persuaded by FedEx's attempts to evade Haynes. FedEx asserts that Haynes "did not hold that a temporary (Continued)

22

Simply put, the lesson of <u>Haynes</u> is that a temporary impairment rises to the level of a disability if it substantially limits a major life activity, or if it is regarded as doing so. And, as the district court observed,

> Calef argued, and the jury agreed, that FedEx regarded her as a disabled person who was unable to perform essential functions of her job[, thereby rendering her substantially limited in the major life activity of working]. Thus, whether FedEx [treated Calef as being] only temporarily unable to perform such functions, or more permanently unable, is irrelevant; the WVHRA is applicable under either scenario.

Post-trial Order 8. We agree with the district court that, under controlling West Virginia law, the jury was entitled to find that FedEx regarded Calef as disabled based on evidence

---

impairment can be a disability," in that such issue was not before the state supreme court because it was conceded by defendant Rhone-Poulenc. Br. of Appellant 25. While it is true that Rhone-Poulenc conceded disability, the court did not have to accept such a concession, <u>see</u> <u>Turner v. Holland</u>, 332 S.E.2d 164, 165 (W. Va. 1985), and, indeed, the notion of Haynes's impairment being only temporarily disabling was central to the court's decision. FedEx also misidentifies Haynes's disability as being "migraines and hypertension, neither of which was temporary." Br. of Appellant 25. The court observed that Haynes "had suffered for some time from migraines and hypertension," but that she only became disabled after she became pregnant. <u>Haynes</u>, 521 S.E.2d at 333 ("[D]ue to her hypertension, the plaintiff's pregnancy was high-risk . . . ."); <u>id.</u> at 337 ("The defendant does not contest that the plaintiff's high-risk pregnancy, complicated by medical conditions, met the legal test of a disability.").

23

that FedEx treated Calef as though she had a substantially limiting impairment — whether temporary or long-term.[8]

2.

Next, FedEx asserts that the jury could not reasonably have found that FedEx acted on a mistaken belief about Calef's condition, "as required for a 'regarded as' claim." Br. of Appellant 24. Rather, FedEx maintains, the trial evidence demonstrates that it innocently relied on information provided by Calef and her doctors. According to FedEx, "a defendant who acts in response to information from the plaintiff or her doctors, not in response to a mistaken assumption about the plaintiff's abilities, has not 'regarded' plaintiff as disabled." Id. at 30. Unfortunately for FedEx, both aspects of this theory — that the WVHRA requires proof of the employer's mistaken belief, and that the record inescapably shows FedEx's reliance on Calef and her doctors — are without merit.

---

[8] On a related note, FedEx contends that the district court erred in rejecting a proposed instruction requiring Calef to prove that FedEx regarded her as having "an impairment that substantially limited a major life activity and was not of a temporary nature." J.A. 176 (emphasis added). Because such instruction is contrary to West Virginia law, the court properly refused to include it in the jury charge. Furthermore, the court appropriately instructed the jury on the definition of "substantially limits" set forth in West Virginia Code of State Rules section 77-1-2.5.3.

24

For the proposition that the WVHRA requires proof of mistaken belief, FedEx invokes federal disability discrimination law, noting that "[f]ederal courts have uniformly held that only a mistaken belief can result in regarded as liability under the ADA." Br. of Appellant 31 (citing, inter alia, Sutton v. United Air Lines, 527 U.S. 471, 489 (1999)). FedEx then asserts that "[t]here is no basis in the [WVHRA] to doubt that West Virginia would follow these ADA decisions and hold that regarded as liability requires that the employer be mistaken in its perceptions about the employee's condition." Id. at 31-32. To the contrary, the Supreme Court of Appeals of West Virginia has addressed this very question and eschewed the subjective federal approach. In its 2000 decision in Stone v. St. Joseph's Hospital of Parkersburg, the court observed that the "regarded as" issue is to be resolved by way of an objective test. See 538 S.E.2d 389, 407 n.25 (W. Va. 2000) (explaining that "objective test" of whether employer treated employee as having substantially limiting impairment "does not focus on the subjective motivation behind the behavior in question, but on the behavior itself"); see also id. at 406 (recognizing that question before jury was not "what the Hospital said about their subjective view of Mr. Stone," but rather "what the Hospital did"). Here, there was sufficient evidence to support the

jury's finding that FedEx — whatever its subjective belief — objectively treated Calef as being disabled.

Moreover, the evidence does not, as FedEx argues, conclusively establish that FedEx merely acted on information provided by Calef and her doctors. As the district court observed, there is

> [n]o doubt [that] FedEx relied in part on [the doctors'] notes in making its decision to place Calef on leave. What it fails to comprehend, however, is that none of these notes indicated Calef was unfit to work or that she desired to be placed on leave. In fact, during trial Calef testified that she was surprised and upset when FedEx told her she was no longer permitted to work, and she wanted "everyone [to know] that I was not asking to be put on short term disability." Moreover, the jury clearly found that Calef was still able and competent to perform the essential functions of her job on the date that FedEx placed her on leave, despite the limitations described in these notes.

Post-trial Order 15 (quoting J.A. 1102) (citation omitted). In these circumstances, we are constrained to affirm the denial of FedEx's Rule 50 motion with respect to the jury's "regarded as" finding.

B.

We turn next to FedEx's argument, presented in its Rule 50 motion, that the trial evidence was insufficient to support the jury's finding that Calef was able and competent to perform essential functions of her P&D Service Manager position at the time FedEx forced her to take disability leave. See W. Va. Code

26

R. § 77-1-4.2 (recognizing that job function may be considered "essential" on several bases — for example, if "the reason the employment position exists is to perform that function"). The merit of this contention largely turns on whether package delivery was an essential function of Calef's job — a factual issue that was hotly disputed.

At trial, FedEx took the position that, because Calef was unable to lift more than twenty pounds, she was incapable of performing the essential function of delivering packages. FedEx's evidence on this issue included the testimony of Chris Davis, Calef's immediate predecessor as P&D Service Manager at the Clarksburg home delivery terminal, who averred that he regularly delivered packages while holding the P&D Service Manager position. Calef impeached Davis with his pretrial deposition testimony, however, in which he omitted package delivery from a detailed list of P&D Service Manager responsibilities. Calef also presented the jury with written job descriptions for the P&D Service Manager, prepared by FedEx, that failed to identify package delivery among the enumerated duties. See, e.g., supra note 2 (discussing January 23, 2004 performance expectation plan provided to Calef by FedEx); see also W. Va. Code R. § 77-1-4.2 (providing that, "if an employer has prepared a written description before advertising or

27

interviewing applicants for the job, this description may be considered evidence of the essential functions of the job").

The jury sided with Calef, finding that she was able and competent to perform the essential functions of her job — and, thus, that delivering packages was not one of them. The district court refused to disturb the jury's finding, explaining that,

> [w]hen viewed in the light most favorable to Calef, the evidence presented by Calef established that lifting and delivering packages was not an essential function of her job. Furthermore, FedEx did not present any evidence that Calef could not perform other functions which were undisputedly "essential," such as training and managing other employees, [and] joining contractors on two service rides a week . . . . Accordingly, a reasonable jury . . . could have concluded [Calef] was able and competent to perform the essential duties of her job.

Post-trial Order 18. Because the best we can say for FedEx is that the evidence on the "essential functions" issue was conflicting, we must affirm. See Bakkebo, 506 F.3d at 294 ("If reasonable minds could differ about the verdict, we are obliged to affirm the ruling of the district court [denying Rule 50 relief].").

C.

We next assess FedEx's contention, also presented in its Rule 50 motion, that its decision to place Calef on disability leave "was a reasonable, nondiscriminatory action intended to allow her to recover from what all expected would be a temporary

28

impairment." Br. of Appellant 40. In so asserting, FedEx relies on the following passage from the West Virginia supreme court's Stone decision:

> [T]he law recognizes the right of an employer to take reasonable job-related precautions in a fashion that is consistent with the duty of reasonable accommodation, while inquiring or obtaining medical information about an employee's fitness for duty. Thus, the mere fact that the Hospital sent Mr. Stone for an independent medical examination did not prove a case of disability discrimination — nor did the mere fact that he was placed in a "light duty" assignment while he was awaiting such an examination and its results prove a case of disability discrimination.

538 S.E.2d at 407. Based on the evidence before it, the Stone court concluded that the Hospital had justifiably reassigned Stone "to another suitable full-time position, at the employee's regular rate of pay and without any long-term or permanent detriment to the employee, pending the results of an otherwise permissible medical examination." Id. at 408. The court observed that such conduct — "absent otherwise egregious circumstances" — simply "is not prohibited disability discrimination under our Human Rights Act." Id.

FedEx urges us to analogize its treatment of Calef to the Hospital's treatment of Stone. Such an analogy, however, is impossible to draw. FedEx did not reassign Calef to another suitable position, at her regular salary and without any long-term detriment to her. Rather, FedEx forced Calef to "go home," file a claim for short-term disability benefits, and stay away

29

from work until FedEx contacted her with additional instructions. J.A. 1101. Calef was then forced to subsist on disability benefits, of finite duration, at a fraction of her salary, while FedEx spurned her requests to return to work. Indeed, whereas the Hospital had proactively sought to ascertain Stone's condition and ability to safely work, FedEx simply proclaimed Calef to be disabled and prematurely abandoned its own reasonable accommodation process without fully examining whether Calef could remain on the job. "Given this evidence," the district court observed, "Stone did not prohibit the jury from concluding that FedEx had engaged in impermissible discrimination, rather than reasonable accommodation, when it placed Calef on leave." Post-trial Order 20. We agree.[9]

---

[9] We further agree with the district court's observation that, "because the jury found that Calef was able and competent to perform the essential functions of her job when FedEx directed her to go on leave, it is not surprising that the jury rejected FedEx's explanation that its actions were legitimate and non-discriminatory." Post-trial Order 20. In view of the evidence and the verdict, the jury very well may have concluded that FedEx concocted package delivery as an essential function of the P&D Service Manager position as part of a scheme to get rid of Calef by deeming her incapable of performing her job. Of course, even if FedEx was motivated by a personal animus against Calef — unrelated to any perceived disability — it is nevertheless liable for disability discrimination under the WVHRA. See Stone, 538 S.E.2d at 407 n.25.

30

Finally, we assess FedEx's assertion that it is entitled to a new trial, under Federal Rule of Civil Procedure 59, on the ground that the jury did not make a requisite finding of pretext. We review a district court's denial of a Rule 59 motion for abuse of discretion, and such ruling "will not be reversed save in the most exceptional circumstances." Bakkebo, 506 F.3d at 294 (internal quotation marks omitted).

As discussed above, the jury was directed to answer special interrogatories in keeping with West Virginia's burden-shifting evidentiary regime. Once the jury found in Calef's favor on the elements of her prima facie case, it proceeded to consider whether FedEx "articulated a legitimate, non-discriminatory reason for taking its adverse employment action against . . . Calef." Judgment Order 3 (Interrogatory No. 6). Because the jury answered "No," it then entered a verdict for Calef. Id. If the jury had instead answered "Yes," it would have been obliged to consider whether FedEx's "articulated reason for its adverse employment action against . . . Calef[] was a pretext for unlawful disability discrimination." Id. (Interrogatory No. 7).

In seeking a new trial, FedEx points out that, under the burden-shifting regime, "if a defendant has articulated a legitimate[,] nondiscriminatory reason, the jury cannot find in

31

favor of the plaintiff unless it finds that defendant's explanation is a pretext." Br. of Appellant 43. And, FedEx contends, "[t]here is no room for debate about whether [it] articulated a nondiscriminatory reason for putting [Calef] on a paid leave" — that reason being "to prevent [Calef] from further injuring herself and to give her a chance to heal." Id. at 43-44. Thus, according to FedEx, the jury's finding that FedEx did not articulate a legitimate, nondiscriminatory reason for the leave decision "cannot stand." Id. at 44.

Fatal to FedEx's contention, the jury could have found that FedEx did not satisfy its burden if either (1) FedEx gave no reason for its decision to force Calef to take disability leave, or (2) FedEx's proffered reason was not legitimate and nondiscriminatory. Because it is clear that FedEx proffered a reason for the leave decision, the jury necessarily found that such reason was not legitimate and nondiscriminatory. And, the evidence was sufficient to sustain that finding — as we already explained in rejecting FedEx's effort to secure Rule 50 relief on the ground that the leave decision was a reasonable accommodation, not impermissible discrimination.

To be sure, the form of the special interrogatories — particularly the application of the burden-shifting regime — was imperfect. The burden-shifting regime was intended for use in deciding pretrial dispositive motions, and "was not . . .

32

necessarily designed to facilitate jury analysis." Skaggs v. Elk Run Coal Co., 479 S.E.2d 561, 585 (W. Va. 1996). Moreover, the purpose of the burden-shifting regime is to ferret out and prove discriminatory animus, see id. at 581 — but, as we have emphasized herein, discriminatory animus is not an essential element of a WVHRA "regarded as" disability discrimination claim, see Stone, 538 S.E.2d at 407 n.25. In any event, the special interrogatories were sufficient to elicit jury findings on each of the elements of Calef's claim:

- That Calef was a qualified disabled person under the WVHRA, in that FedEx objectively treated her as being substantially limited in the major life activity of working, see Stone, 538 S.E.2d at 406;

- That Calef was actually "able and competent to perform the services required," W. Va. Code § 5-11-9(1), even without accommodation; and

- That FedEx subjected Calef to an adverse employment action — one which amounted to "prohibited disability discrimination," rather than a permissible effort at reasonable accommodation, Stone, 538 S.E.2d at 408.

Additionally, FedEx did not object to the special interrogatories — which the district court based on proposed interrogatories submitted by FedEx itself. As such, FedEx has waived any challenge to the form of the interrogatories. See AG Sys. v. United Decorative Plastics Corp., 55 F.3d 970, 973 (4th Cir. 1995). Accordingly, we affirm the district court's denial of FedEx's Rule 59 request for a new trial on the ground that

33

the jury was required, but failed, to make a finding on the pretext issue.[10]

## IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

---

[10] As explained above, we reject the balance of FedEx's appellate contentions and, in so doing, adopt the reasoning of the district court. As presented in its Rule 50 motion, FedEx asserts that it is entitled to judgment as a matter of law on the ground — properly deemed by the district court to be moot — that it did not owe Calef a duty of reasonable accommodation because she was only regarded as disabled. Furthermore, FedEx requests a new trial under Rule 59 on three additional grounds (two with multiple subparts): that the verdict was against the clear weight of the evidence; that the district court made four erroneous evidentiary rulings; and that the court committed four instructional errors (including the purported error discussed supra note 8). Lastly, FedEx challenges four aspects of the court's rulings on damages and attorney fees: the refusal to offset Calef's back pay award by the amount of disability and medical benefits that she received; the inclusion of law school costs as an element of damages; the refusal to reduce the back and front pay awards to account for periods when Calef was unable to work (a contention that was probably not preserved); and the failure to fully exclude work on the time-barred sex discrimination claim from the attorney fee award.